

*In the*

*Missouri Court of Appeals*

*Western District*

| | |
|---|---|
| NOELLE HANKS, SUCCESSOR TRUSTEE OF THE WILLIAM L. HANKS TRUST AGREEMENT OF JUNE 14, 2006, | WD76608 |
| **Respondent,** | OPINION FILED: |
| v. | JUNE 3, 2014 |
| PHIL MORRIS, | |
| **Appellant.** | |

**Appeal from the Circuit Court of Nodaway County, Missouri
The Honorable Roger Martin Prokes, Judge**

**Before Division One: Joseph M. Ellis PJ., Karen King Mitchell,
Anthony Rex Gabbert, JJ.**

Phil Morris appeals from a judgment entered upon a jury verdict finding in favor of

Noelle Hanks (Plaintiff), successor trustee of the William L. Hanks Trust Agreement of June 14,

2006. The jury's verdict was against Morris for compensatory damages in the amount of

$450,000 and punitive damages in the amount of $400,000 on Plaintiff's "Second Amended

Petition for Accounting, Surcharges to the Former Trustees and for Damages for Fraud and

Conversion and for Punitive Damages and Other Relief" which claimed that Morris and his co-

defendants improperly managed the William L. Hanks Trust. Morris asserts four points on

appeal. First, Morris contends that the circuit court erred in refusing to instruct the jury that, if it

determined Morris was a trustee with special skills or knowledge, or named as trustee on that basis, it could consider whether Morris was entitled to additional compensation. Second, Morris contends that the circuit court erred in refusing to instruct the jury on the proper legal standard for the imposition of liability upon a trustee for the actions of a co-trustee. Third, Morris asserts that the circuit court erred in giving Instruction No. 6 to the jury because he claims that the instruction failed to set forth the essential statutory elements for co-trustee liability. Fourth, Morris asserts that the circuit court erred in denying his post-trial motion for remittitur of punitive damages alleging that the damages imposed by the jury are grossly excessive and contrary to the law. We affirm.

The evidence in the light most favorable to the jury's verdict shows that Morris began farming for William Hanks's father in 1969. Morris developed a friendship and business relationship with William Hanks in 1977 when Hanks moved back to Missouri after living in Oregon. Morris testified that, in 2006, Hanks called Morris to Hanks's home and asked Morris if he would act as trustee of his trust, along with Larry D. Owens, after Hanks's death. Morris testified that Hanks told him that he wanted Morris as trustee because he had knowledge of Hanks's farms. On June 14, 2006, Hanks executed the William L. Hanks Revocable Trust Agreement wherein he designated himself as trustee and Morris and Owens as successor co-trustees. In May of 2008, Hanks died and Morris and Owens became acting co-trustees of the Hanks Trust. At the time Morris and Owens took over as trustees, the trust had beginning assets valued at nearly 1.5 million dollars. These assets consisted mainly of farm real estate and a brokerage account.

On June 4, 2008, Morris and Owens hired Debra Owens, Owens's wife, as the accountant for the Hanks Trust. Debra operated a sole-proprietorship titled Dollars and Cents Accounting

2

and Tax Service. The engagement letter indicated that service reimbursement would be at the rate of $50 per hour. For the approximate three year period from June 3, 2008, to May 15, 2011, Debra's business was paid $67,544 in service fees from the Hanks Trust. During that same three-year time period, Morris collected $100,908 in trustee's fees and Larry Owens collected $163,720 in trustee's fees.

Morris testified at trial that, prior to Hanks's death, Morris worked with Hanks on improving his farm properties through terracing work for soil conservation to maintain the value of the farmland and meet government guidelines for a government cost share program. Morris testified that he was not paid for his work on these farm improvements at the time he did the work. Some of the work Morris contended that he was not paid for went as far back as 2004. There is no dispute, however, that all of this alleged work was performed prior to Hanks's death. Morris testified that he paid himself for these farm improvements out of the trust after Hanks's death and these payments totaled over $92,000. Morris acknowledged, however, that only approximately $9,000 of the $92,000 that he was paid for these farm improvements was for work done to land in the Hanks Trust. Morris testified that the other over $80,000 was actually for improvements he did to land in Hanks's father's trust. Although Hanks was one beneficiary of his father's trust, there were other beneficiaries in that trust different from the beneficiaries named in Hanks's trust.[1] The documentation Morris had to support his billing for the farm improvements consisted of brief summaries that he claims to have made from original time card records. He testified that he kept the original time cards in a box, but destroyed those original records after he made his bills out to Dollars and Cents Accounting.

---

[1]It appears from the record that William Hanks's father had established a trust of his own prior to his death which included land that Morris apparently farmed and/or helped maintain.

Larry Owens, Morris's co-trustee, was part owner of a developmental league baseball team located in Hannibal, Missouri, known as the Hannibal Cavemen. There were three entities involved in this venture: Clemens Field Development, Hannibal Sports and Entertainment Group, and Hannibal Baseball Investment Group. Owens owned one-third of Clemens Field Development, 50% of Hannibal Sports and Entertainment Group, and 38% of Hannibal Baseball Investment Group. In March of 2009, the Hanks Trust transferred $150,000 to Clemens Field Development. In September of 2009, Morris and Owens signed a document pledging a loan in the amount of $200,000 to Hannibal Sports and Entertainment Group.[2]

Larry Owens and his wife, Debra, were also co-owners of a startup winery/bed and breakfast named Casa de Loco Winery. Larry owned a 95% interest and Debra owned a 5% interest in the business. Approximately two months after Hanks died, both Morris and Owens signed a check transferring $30,000 from the Hanks Trust to Casa de Loco. On January 2, 2009, Owens transferred another $40,000 to Casa de Loco, and on March 1, 2009, Owens transferred $20,000 to Casa de Loco. The transfers from the Hanks Trust to Casa de Loco eventually reached nearly $140,000. The evidence at trial showed that the Trust would likely be unable to recover any assets from the baseball investment or Casa de Loco Winery.

In March of 2009, all creditors of the Hanks Trust and estate had been paid and all beneficiaries of the Hanks Trust had received their bequests with the exception of Hanks's daughters, Noelle Hanks and Tiffany Wiederhorn, whom Morris and Owens did not pay. These daughters were each bequeathed $1,000. Larry Owens's son, Casey Owens, was bequeathed $100,000 and was paid his share from the Trust on January 2, 2009.

---

[2]Morris confirmed in his trial testimony that he authorized this transaction.

The University of Oregon Foundation was the remainder beneficiary of the Hanks Trust. On June 4, 2008, Morris's and Owens's then attorney, Jere Loyd, sent the Foundation a letter advising the Foundation of Hanks's death and notifying the Foundation that Morris and Owens were the successor co-trustees of the Hanks Trust. Over the next several months, the Foundation's attorney corresponded with Loyd in an attempt to receive an accounting from the co-trustees. On April 22, 2009, Loyd sent Morris and Owens a letter advising them of the Foundation's requests for an accounting and informing them that they were obligated to report to the beneficiary at least annually. Loyd suggested to Morris and Owens that an accounting be prepared from the beginning of their administration through the end of 2008. Morris and Owens failed to provide an accounting at that time. Morris testified that, at some point, Morris and Owens discussed contacting the Foundation to determine the Foundation's position with regard to whether the trust should be left open or whether the Foundation wanted to directly take the land in the trust, but instead decided to "just let it ride for a while." Over eight months after Loyd sent his first letter to Morris and Owens, Loyd sent another letter advising them again of the Foundation's request for an accounting and their obligation to provide one. Eventually, on January 28, 2010, the Foundation was provided "Charge and Discharge Statements" for 2008 and 2009 and was later provided statements for 2010. On July 14, 2010, counsel for the Foundation sent a letter to Loyd expressing concern that the statements evidenced "bafflingly large" and "extreme" accounting and trustee's fees and requested a prompt and comprehensive explanation. The letter also expressed concern that the trustees were supposed to be expeditiously liquidating the assets of the Hanks Trust, but little progress had been made towards that end.

Approximately one year later, in July of 2011, the Foundation and Hanks's two daughters filed suit against Morris and Owens seeking, among other relief, an injunction against further

spending or asset disposition by Morris and Owens and their removal as trustees. A Second Amended Petition added claims for punitive damages and added Debra Owens as a party. Morris and Owens ultimately resigned as trustees.[3] On April 12, 2013, the jury found Morris liable to the Hanks Trust for $450,000 in compensatory damages and $400,000 in punitive damages. Morris's post-trial Motion for New Trial and for Remittitur of Punitive Damages was denied. Morris appeals.

In Morris's first point on appeal, he contends that the circuit court erred in refusing to instruct the jury that, if it determined Morris was a trustee with special skills or knowledge, or named as trustee on that basis, it could consider whether Morris was entitled to additional compensation. Morris argues that he was entitled to an instruction on his affirmative defense theory that he was a trustee with special skills and knowledge who applied those skills in carrying out his fiduciary duty, and he was prejudiced by the jury not being instructed that it could take those skills and knowledge into consideration in determining the appropriate compensation due Morris. He argues that his proffered "Instruction Y" was a proper statement of Missouri law and supported by the evidence. We find no error.

When a party claims that the trial court erred in refusing to submit a non-MAI instruction, we review the court's denial of that instruction for abuse of discretion. *McCullogh v. Commerce Bank*, 349 S.W.3d 389, 396 (Mo. App. 2011). The court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *St. Louis County v. River Bend*

---

[3]On May 22, 2012, Morris filed suit against Owens for his alleged breaches of trust as co-trustee of the Hanks Trust. He received a default judgment against Owens in the amount of $705,646.54. Morris assigned his rights in the judgment to the Hanks Trust, but the trust declined to accept the assignment. Morris's brief indicates that Owens declared personal bankruptcy the day before the trial date and has a bankruptcy case pending. The record indicates that, at some point, the Foundation chose to accept what it had already received under the Hanks Trust and removed itself from the litigation.

6

*Estates Homeowners' Ass'n*, 408 S.W.3d 116, 134 (Mo. banc 2013).  If we find that the court erred in refusing to give an instruction, we will only reverse if the refusal was prejudicial to the offering party and materially affected the merits of the action.  *Freight House Lofts Condo Ass'n v. VSI Meter Services, Inc.*, 402 S.W.3d 586, 595 (Mo. App. 2013).  Rule 70.02(a) provides that all instructions "shall be given or refused by the court according to the law and the evidence in the case."  "[A] party is entitled to an instruction upon any theory supported by the evidence." *Cluck v. Union Pacific R. Co.*, 367 S.W.3d 25, 33 (Mo. banc 2012).  However, "even when a party is entitled to have an instruction submitted, the trial court does not have a duty to submit a correct instruction in the place of the parties' erroneous instruction."  *Id.*

Morris proffered "Instruction Y" which Morris presented as being applicable to Section 456.8-806, RSMo Cum. Supp. 2013.  He claims that the instruction addressed his affirmative defense that he provided valuable and necessary services to the Trust, including work related to maintaining the condition of the farm property as a productive asset for which the beneficiaries benefitted.  He also contends that Instruction Y reflects a proper statement of Missouri law pursuant to the official comments to Section 456.7-708, RSMo Cum. Supp. 2013.  Morris's proposed Instruction Y stated:

> On the claim of the plaintiff for compensatory damages against Phil Morris
> related to his Trustee fees if you believe:
>
> First, either
>
> > Phil Morris was a trustee who has special skills or expertise
>
> > Phil Morris was named trustee in reliance upon the his [*sic*] representation
> that he had special skills or expertise,
>
> Second, you are entitled to consider if Phil Morris may be entitled to extra
> compensation for performing services that would ordinarily be delegated.

7

We do not find Morris's proposed Instruction Y to be a proper statement of Missouri law pursuant to Section 456.8-806 or Section 456.7-708. Section 456.8-806 does not address trustee compensation. Section 456.8-806 merely states that, "[a] trustee who has special skills or expertise, or is named trustee in reliance upon the trustee's representation that the trustee has special skills or expertise, shall use those special skills or expertise."

Although Morris proffered Instruction Y as following Section 456.8-806 and argues on appeal its applicability to that statute, he also argues that a Uniform Trust Code comment to Section 456.7-708 suggests relevant factors that may be taken into consideration when determining *reasonable compensation* pursuant to Section 456.7-708. *See* 4C FRANCIS M. HANNA, MISSOURI PRACTICE, TRUST CODE AND LAW MANUAL § 456.7-708 UTC Comment (2013-1014). He argues that the factors suggested in the comment are applicable to him and for consideration of the compensation he received as trustee under the Hanks Trust. Yet, Morris and his proposed Instruction Y ignore the express language Section 456.7-708. Section 456.7-708 states, in relevant part:

1. If the terms of the trust do not specify the trustee's compensation, a trustee is entitled to compensation that is reasonable under the circumstances.

2. If the terms of a trust specify the trustee's compensation, the trustee is entitled to be compensated as specified, but the court may allow more or less compensation if:

   (1) the duties of the trustee are substantially different from those contemplated when the trust was created; or

   (2) the compensation specified by the terms of the trust would be unreasonably low or high.

Here, the terms of the Hanks Trust specify the trustee's compensation. The Hanks Trust provides that the trustee "shall be compensated for its services as provided in the schedule of fees

8

published by The Country Club Trust Company, of Kansas City, Missouri, in effect at the date the services are rendered." Therefore "the terms of the trust [] override the reasonable compensation standard, subject to the court's inherent equity power to make adjustments downward or upward in appropriate circumstances." HANNA, MISSOURI PRACTICE, TRUST CODE AND LAW MANUAL § 456.7-708 UTC Comment. Pursuant to Section 456.7-708, Morris would have only been entitled to compensation above that provided by the trust document if his trustee duties were substantially different from those contemplated when the trust was created or if the compensation specified by the terms of the trust was unreasonably low under the circumstances. Nothing within Morris's proffered Instruction Y mentions this significant provision of Section 456.7-708. Clearly, as Morris claims that he was named trustee based on his knowledge, skills, and the expertise he was to provide to the trust, he cannot argue that his trustee duties were substantially different from those contemplated when the trust was created. Additionally, the evidence does not support that the compensation provided for in the trust was unreasonably low for the services Morris actually provided, thereby justifying an instruction based on Section 456.7-708.[4]

Morris argues that, because of his special skills and expertise, he was entitled to fees for special or extraordinary services under the Country Club Trust Company fee schedule because the schedule allows for such in its provision for "Fees for Special or Extraordinary Services." This provision states:

> The foregoing charges are for standard and customary services performed by Country Club Trust Company. Additional charges may be assessed if special or extraordinary services are required, including reimbursement of actual costs to third-parties. These include, but are not limited to, processing discretionary

---

[4]We view the evidence in the light most favorable to submission of the instruction. *Vandergriff v. Missouri Pacific R.R.*, 769 S.W.2d 103, 104 (Mo. banc 1989).

distributions, payment of bills, preparation of tax returns, monthly adjustments to the principal balance of assets, preparation for and involvement in litigation, and participation in the management or sale of a business venture.

Thomas Wallingford, a Country Club Trust Company trust officer, confirmed in his testimony that the Country Club Trust Company might assess additional charges against a trust if special or extraordinary services are required in managing the trust. He testified that, active management of a farm would be an extraordinary service. He testified that, dealing with partition actions, dealing with quiet title actions, doing actual farm maintenance, and acting as an agent on behalf of the trust in negotiating a sale price are also extraordinary services. He testified that, if the County Club Trust Company utilizes extraordinary services, the beneficiaries are consulted and advised.

We first note that Morris accepted the position of trustee under the terms of the trust and could have petitioned the court pursuant to Section 456.7-708.2 to consider additional fees if he believed the fees set forth by the trust were unreasonably low. This would have allowed the beneficiaries of the trust the opportunity to dispute Morris's contention and protect their interests. Morris did not consult the court nor did he consult or advise the trust beneficiaries of the need for additional fees for extraordinary services. Instead, Morris chose to determine his own fee schedule and relies on the language in the Country Club Trust Company fee schedule regarding extraordinary services to argue that he justifiably charged the trust for those extraordinary services and that he was entitled to an instruction regarding that defense. Yet, there is no evidence that the schedule of fees published by the Country Club Trust Company was unreasonably low for the services Morris performed.

The Country Club Trust Company was named in the Hanks Trust as the successor trustee if Morris and Owens failed to serve or chose not to serve. Wallingford, a trust officer for the

10

Country Club Trust Company, testified at trial that, the fee schedule at the time Morris and Owens first became trustees was 1.1 % on the first million dollars in assets, and .6% for the next $500,000 in assets. Wallingford testified that these fees would have included accounting services provided by the Country Club Trust Company. Wallingford testified that, if the Country Club Trust Company had managed the Hanks Trust, the trust would have been charged $38,000 in trustee fees for the approximate three-year time period that Morris and Hanks governed the trust. The approximate total of trustee and accounting fees paid by the Hanks Trust to Morris and Owens, excluding the $67,544 paid to Owens's wife for accounting services, was $264,628.

The Country Club Trust Company fee schedule sets forth a fee for standard and customary services performed by the trustee, and then allows for additional charges for extraordinary services. There was no evidence at trial that Morris first accepted the fee within the schedule for his standard and customary services, and then assessed additional charges for extraordinary services. Rather, Morris assessed the trust $125 per hour for all services he performed. While Morris's affirmative defense, as set forth in his petition, claims that he performed work related to maintaining the condition of the farm property as a productive asset for which the beneficiaries benefitted, Morris billed the trust $92,000 separately for these farm improvements. While Morris argues that an extensive portion of his time as trustee was also devoted to the marketing and sale of the farm property, the evidence shows that a realtor was paid $37,339 for the sale of one tract of land and an auctioneer was paid $20,280 for the sale of another. One could reasonably infer that these professionals earned their fees based on their own marketing and sale of the farm properties.

Morris's own evidence reflects that many hours of trustee work for which Morris billed the trust did not require special skills and knowledge in maintaining farm property, installing soil

11

conservation terraces, and maintaining terrace work. For example, Morris's Exhibit 101 contains a section titled "Farm Sale & Maintenance." It describes trustee work performed and the number of hours worked. On April 1, 2010, Morris billed the trust one hour ($125) for: "Spoke to Phil Blasier about days for trash." On April 3, 2010, Morris billed the trust eight and a half hours ($1062.50) for: "Rain so I worked in implement shed to start cleaning out junk iron and trash all day." On April 12, 2010, Morris billed the trust three hours ($375) for: "Rain again – contacted people to please dump scrap and trash dumpster and then hauled load to Mound City myself." On April 24, 2010, three hours ($375) for: "Rain – pulled old pickup out of the building and re-inflated [tires] and cleared out cab of paper and documents of registration and licensing." On April 25, 2010, seven hours ($875) for: "started on west wall now; doors and signs and junk that was of no value moved to the north wall."

Also on Morris's Exhibit 101 is a section titled "General Trust Fund Duties" and a section titled "Legal." Morris billed the trust a total of $11,062.50 for "General Trust Fund Duties" and $12,437.50 for "Legal" duties. There was no evidence that these "general" or "legal" duties utilized Morris's special farm knowledge or expertise such that they would be considered "extraordinary." Morris's argument on appeal that "there was no evidence presented that Morris did not perform the work shown on exhibits 101 and 102, nor the farm improvement work as shown on exhibits 108 and 109" and that the evidence showed that Morris "has special skill and knowledge in his profession with regard to maintaining farm property, installing soil conservation terraces and maintaining that terracing work" suggests entitlement to a presumption that he used his special skill and knowledge in all of the work he performed for the trust. Given the evidence, such a presumption is unwarranted.

12

We find that the circuit court did not abuse its discretion in refusing to submit Instruction Y to the jury. Instruction Y did not follow substantive law with regard to Morris's affirmative defense that he performed special skills as trustee thereby entitling him to additional fees for the performance of extraordinary services. Further, even if the evidence might have supported an instruction setting forth Morris's affirmative defense, which we find questionable, the court had no duty to submit a correct instruction in the place of Morris's erroneous instruction. Point one is denied.

In Morris's second point on appeal, he argues that the circuit court erred in refusing to instruct the jury on the proper legal standard for the imposition of liability upon a trustee for the actions of a co-trustee. Morris contends that he was entitled to an instruction that was a proper and complete statement of Missouri law and supported by the evidence. He contends that he took remedial action in response to the breach of duty by his co-trustee and was prejudiced by the jury not being instructed that such remedial actions could be a basis for relieving Morris of liability for the actions of co-trustee Owens. Therefore, he claims that the court erred in failing to submit his proposed Instruction X to the jury. We find no error.

Morris's proposed Instruction X reads:

On the claim of the plaintiff for compensatory damages against Phil Morris related to the activities of Larry Owens:

First, your verdict must be for the plaintiff and against Phil Morris if you believe Phil Morris joined in the actions of Larry Owens.

Second, your verdict must be for Phil Morris and against the plaintiff if you believe:
    (1) Phil Morris exercised reasonable care to prevent Larry Owens from committing that serious breach of trust; and

    (2) Phil Morris exercised reasonable care to compel Larry Owens to redress that serious breach of trust.

13

> If you do not believe Phil Morris exercised reasonable care under paragraphs (1)
> and (2) above your verdict must be for the plaintiff and against Phil Morris

Morris's proposed Instruction X is misleading with regard to the substantive law of co-trustee liability as set forth in Section 456.7-703, RSMo Cum. Supp. 2013, and we disagree with Morris's contention that Instruction X parallels this statute. Section 456.7-703.6 states: "*Except as otherwise provided in subsection 7 of this section*, a trustee who does not join in an action of another trustee is not liable for the action." (Emphasis added). Subsection 7 provides that: "Each trustee shall exercise reasonable care to: (1) prevent a cotrustee from committing a serious breach of trust; and (2) compel a cotrustee to redress a serious breach of trust." Instruction X does not parallel Section 456.7-703 because it presents the statutory language in the reverse and fails to note at the outset that there are exceptions to a co-trustee's avoidance of liability for the actions of a malfeasant co-trustee where the co-trustee does not join in that action. It is misleading in that it states in the first paragraph that Morris must have joined in the actions of Owens in order to incur liability, and then in the second paragraph presents that the jury verdict must be for Morris if he exercised reasonable care to prevent a serious breach of trust by Owens and exercised reasonable care to compel Owens to redress that breach. Therein, Morris confusingly inserts a converse instruction in the body of the verdict director. Significantly, Instruction X omits a necessary element for tortious conduct – that the Hanks Trust suffered damage as a result of Morris's conduct.[5] We find that the court did not abuse its discretion in refusing to submit Instruction X to the jury. Point two is denied.

---

[5]"Tort law focuses on three basic elements: duty, breach and damages." *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Center Co.*, L.P., 75 S.W.3d 247, 257 (Mo. banc 2002).

In Morris's third point on appeal, he claims that, in addition to erring by not submitting his proposed Instruction X to the jury, it was concurrent error for the court to instead submit Instruction No. 6 to the jury because the instruction failed to set forth the essential statutory elements for co-trustee liability. We find no error.

"Whether a jury was instructed properly is a question of law this [c]ourt reviews de novo." *Hervey v. Missouri Dept. of Corrections*, 379 S.W.3d 156, 159 (Mo. banc 2012). Although Morris claims that Instruction No. 6 was erroneous, he failed to object to this instruction at trial and, therefore, did not preserve this argument for review. *Gorman v. Wal-Mart Stores, Inc.*, 19 S.W.3d 725, 729 (Mo. App. 2000). While Morris argues in his brief that "[n]either Plaintiff or Defendant were given the opportunity to object on the record to the instruction ordered by the Court," the record reflects that the court discussed Instruction No. 6 on the record, indicated that it would be submitted, and then moved on to discuss Instruction No. 7. There is nothing in the record to indicate that Morris was prevented from objecting. Rule 70.03 requires that a party make a specific objection to jury instructions prior to submission to the jury. *Id.* Rule 70.03 states: "Counsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."

Morris further argues that he preserved this claim because he objected to the instruction offered by the Plaintiff which the court ultimately modified to create Instruction No. 6. He argues that the part of that instruction that he objected to remained the same in Instruction No. 6. We find that, even if Instruction No. 6 was properly objected to, Morris's claims as to its error still have no merit.

15

Instruction No. 6 reads:

On the claim of plaintiff for compensatory damages against defendant your verdict must be for plaintiff and against defendant if you believe:

First, either:

> defendant failed to administer the trust solely in the interests of the beneficiaries, or

> defendant failed to administer the trust as a prudent person would, or

> defendant failed to keep the beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests, or

> defendant failed to exercise reasonable care to prevent co-Trustee, Larry Owens, from committing a serious breach of trust, and

Second, as a direct result of any of the actions specified in paragraph First, above, the William L. Hanks Trust sustained damage.

First, Morris complains that Instruction No. 6 does not track Section 456.7-703 as it pertains to co-trustee liability. There is no requirement that a non-MAI instruction's language must track statutory language, just that it must follow the substantive law and be readily understood. *See Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 200 (Mo. App. 2013). Second, Morris argues in essence that, Instruction No. 6 does not follow the substantive law of Section 456.7-703.7 because it fails to include both the "prevention" and "redress" elements as a defense to Morris's liability for Owens's serious breaches of trust. Morris argues that there was substantial evidence that Morris undertook efforts to redress Owens's breaches once discovered[6] and, therefore, Instruction No. 6 should have included the defense of exercising reasonable care to compel a co-

---

[6]Morris's evidentiary support for this contention is that he filed suit against Owens for Owens's breaches to the Hanks Trust. The record reflects that Morris did not file suit against Owens until suit had already been filed against both Morris and Owens by the beneficiaries of the Hanks Trust.

trustee to redress a serious breach of trust.[7]  Yet, Section 456.7-703.7 states that each trustee shall

exercise reasonable care to:  (1) prevent a co-trustee from committing a serious breach of trust;

*and* (2) compel a co-trustee to redress a serious breach of trust.  Therefore, even if the evidence

showed that Morris exercised reasonable care to compel Owens to redress his breaches of trust,

this would still not provide Morris a defense to failing to exercise reasonable care to *prevent*

Owens from committing a serious breach of trust.  Instruction No. 6's exclusion of the "redress"

language actually removed one possible option for which the jury could have found Morris

liable.  This exclusion benefitted, rather than harmed, Morris.  Therefore, although we find no

error in the exclusion of the "redress" language, even if Morris could prove error, he cannot

prove prejudice.  Point three is denied.

In Morris's fourth point on appeal, he argues that the circuit court erred in denying his

post-trial motion for remittitur of punitive damages alleging that the damages imposed by the

jury are grossly excessive and contrary to the law.  "We review the trial court's denial of a

motion for remittitur for an abuse of discretion." *Peel*, 408 S.W.3d at 211.  "The assessment of

punitive damages is peculiarly committed to the discretion of the jury and the circuit court, and

appellate courts will interfere only in extreme cases." *Payne v. Markeson*, 414 S.W.3d 530, 543

(Mo. App. 2013).  Such cases must evidence an abuse of discretion so grossly excessive that it

shocks the conscience of the court.  *Peel*, 408 S.W.3d at 211.  Three factors considered by courts

to assess whether a punitive damage award is grossly excessive are: "(1) the degree of

reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm

---

[7]With regard to the language regarding co-trustee liability, Instruction No. 6 stated that on Plaintiff's claim for compensatory damages the verdict must be for the Plaintiff if the jury believed that "defendant failed to exercise reasonable care to prevent co-[t]rustee, Larry Owens, from committing a serious breach of trust" and, as a result, the Hanks Trust sustained damage.

suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Estate of Overbey v. Chad Franklin National Auto Sales North*, LLC, 361 S.W.3d 364, 372 (Mo. banc 2012) (internal quotations and citations omitted). "We review the evidence and its reasonable inferences in the light most favorable to the award" and "disregard all adverse inferences." *Holmes v. Kansas City Missouri Bd. of Police Com'rs ex rel. Its Members*, 364 S.W.3d 615, 628 (Mo. App. 2012).

Morris argues that there was no evidence that he acted with an intentional purpose, goal, or motive to cause economic harm to the Trust. He contends that, "[w]hile there may be dispute as to the hourly rate charged by Morris or whether the hours charged were not maintained as accurately as would have been optimal, those relatively minor items do not warrant the imposition of punitive damages." He argues that there was no evidence that he personally participated in or profited from the inappropriate actions of his co-trustee, Owens, and Morris's failure to discover Owens's activities "perhaps rose to the level of plain negligence," which is not enough for an award of exemplary damages.

We find no abuse of discretion. Morris focuses almost exclusively on co-trustee Owens's breaches and argues that Morris was merely negligent, at most, for failing to discover those breaches. In his brief he argues that the jury must have assigned liability to him based upon damage to the trust caused by Owens's activities because "the compensatory damages award assessed by the jury exceeds by over $250,000 the total sums Morris received as trustee fees and reimbursements for accrued farm maintenance and improvements." Yet, our review of the record reveals that the jury could have arrived at its compensatory damage figure solely by considering Morris's own authorized debits from the Hanks trust. Exhibit 2B lists all debits from the trust

18

account and the signatories for those debits.  Exhibit 2B shows that Morris personally authorized trustee payments to himself, farm improvement payments to himself, trustee payments to Owens, and accounting payments to Debra Owens that totaled approximately $290,150.47.  Including the $200,000 loan to Hannibal Sports and Entertainment that Morris pledged in writing and admitted to authorizing in his trial testimony, the total disbursements authorized by Morris amount to $490,150.47.[8]  Wallingford, the trust officer for the Country Club Trust Company, testified that if the Country Club Trust Company had managed the Hanks Trust, the trust would have been charged $38,000 in trustee fees for the approximate three-year time period that Morris and Hanks governed the trust and that sum would have included accounting fees.  Thus, the jury could have found that Morris alone authorized disbursements of approximately $452,150.47 in excess of what the fee schedule set forth for trustee compensation.[9]  The jury assessed compensatory damages in the amount of $450,000.  Therefore, the jury's verdict does not require a presumption that the jury held Morris accountable for Owens's actions as well as his own.

The evidence was more than sufficient to establish all of the Plaintiff's claims against Morris - that Morris failed to administer the trust solely in the interests of the beneficiaries, failed to administer the trust as a prudent person would, failed to keep the beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests, and failed to exercise reasonable care to prevent co-trustee Owens from committing a serious breach of trust.  The compensatory and punitive damages awards combined total $850,000.  As the Hanks Trust was depleted of over a million dollars on Morris's

---

[8]These disbursements signed for by Morris do not include the disbursements solely authorized by Owens or Debra Owens that Morris claims he had only belated knowledge of.

[9]If solely considering Morris's disbursements in this figure, the jury would have also had to find that Morris was not entitled to the $92,000 in farm improvements he purportedly performed prior to the death of William Hanks and prior to becoming trustee.

19

watch, nearly half of that directly attributable to Morris without even considering the actions of his co-trustee, we cannot find the punitive damage award of $400,000 to be an abuse of discretion. Morris flagrantly ignored requests and warnings to account to the trust beneficiaries who were dependent upon his accounting and trustworthiness to protect their interests. The Hanks Trust was financially vulnerable and the evidence showed that Morris took advantage of that vulnerability for his own benefit.[10] Point four is denied.

We conclude, therefore, that the circuit court did not abuse its discretion in refusing to submit Morris's Instruction Y to the jury. Instruction Y does not follow substantive law with regard to Morris's affirmative defense that he performed special skills as trustee thereby entitling him to additional fees for the performance of extraordinary services and, even if the evidence might have supported an instruction setting forth Morris's affirmative defense, the court had no duty to submit a correct instruction in the place of Morris's erroneous instruction. Further, we conclude that the court did not abuse its discretion in refusing to submit Morris's proposed Instruction X to the jury. Instruction X is misleading with regard to the substantive law of co-trustee liability as set forth in Section 456.7-703 and omits the necessary element of damages. Additionally, we conclude that the court did not abuse its discretion by submitting Instruction No. 6 to the jury. The "redress" language of Section 456.7-703.7 was not necessary to the instruction and Morris was not prejudiced by its exclusion. Finally, the court did not abuse its discretion in denying Morris's post-trial motion for remittitur of punitive damages because the

_____

[10]Morris's brief displays that the damages imposed are not excessive in relation to damages allowed in other jurisdictions. Morris notes that the Kansas Trust Code imposes double damages against a breaching trustee who engaged in self dealing transactions. K.S.A. 58a-1002(3)(a). This statute allows for punitive damages in addition to double damages. K.S.A. 58a-1002(3)(c). Here, the combined compensatory and punitive damages total less than double the compensatory damages.

20

damages imposed are not grossly excessive in light of the evidence.  We affirm the circuit court's judgment.[11]

 

 

Anthony Rex Gabbert, Judge

All concur.

---

[11]We grant appellate Respondent Noelle Hanks's Motion for Award of Attorneys' Fees and Costs on appeal in the amount of $13,555.50.  Section 456.10-1004, RSMo Cum. Supp. 2013.